DEAN M. CONWAY
*(counsel for service)*
SARRA CHO
CHRISTOPHER NEE
Email:  conwayd@sec.gov

Attorneys for Plaintiff
Securities and Exchange Commission
100 F Street NE
Washington, DC 20549
Telephone: (202) 551-4412
Facsimile: (202) 772-9245

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>          Plaintiff,<br><br>     vs.<br><br>ROBERT A. KARMANN,<br><br>          Defendant. | Case No.<br><br>**COMPLAINT** |

Plaintiff Securities and Exchange Commission ("SEC") alleges:

## JURISDICTION AND VENUE

1.  The Court has jurisdiction over this action pursuant to Sections 20(b), 20(d)(1) and 22(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §§ 77t(b), 77t(d)(1) & 77v(a), and Sections 21(d)(1), 21(d)(3)(A), 21(e) and 27(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78u(d)(1), 78u(d)(3)(A), 78u(e) & 78aa(a).

2.  Defendant has, directly or indirectly, made use of the means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange in connection with the transactions, acts, practices and courses of

business alleged in this complaint.

3. Venue is proper in this district pursuant to Section 22(a) of the Securities Act, 15 U.S.C. § 77v(a), and Section 27(a) of the Exchange Act, 15 U.S.C. § 78aa(a) because certain of the transactions, acts, practices and courses of conduct constituting violations of the federal securities laws occurred within this district. Defendant committed many of the acts set forth in this Complaint in this district. For example, Karmann maintained an office at Company S and initiated bank transfers and sent emails from his office computer at Company S, which is located in this district.

## SUMMARY

4. This case involves fraudulent securities offerings and a massive Ponzi scheme that raked in over $910 million in investor funds. This Ponzi scheme was orchestrated by Individual 1 and Individual 2 through companies they controlled, and which they used to enrich themselves at investors' expense. The Defendant in this action, Robert Karmann, played an important role in this scheme to sell investment opportunities offered by certain solar energy companies in the business of making, leasing, and operating mobile solar generators ("Generators") -- investments that were touted as presenting gains in the form of tax benefits, guaranteed lease payments, and the resulting profits from the operation of the Generators. In reality, the vast majority of "revenue" sent to investors came from investor money, not from actual lease payments from end-users of the Generators. Beginning in approximately late 2014, Karmann advanced the scheme by transferring and/or coordinating the transfer of funds among various bank accounts to hide the lack of legitimate lease revenue. Karmann also provided reports and financial statements that he knew contained false information to brokers, investors, and/or prospective investors.

5. In 2011, Individual 1 and Individual 2 began selling investment contracts through their privately-held alternative energy companies Company S and Company D (collectively with Individuals 1 and 2 "the Company"). Through December 2018, the Company raised around $910 million from purchasers of the investment contracts.

The Company designed the investments to take advantage of tax credits that were available to certain alternative energy related projects.  To that end, investors purchased Generators from Company S and then immediately leased them to Company D.  Company D was then supposed to sub-lease the Generators to end-users.  The Company touted itself as a major player in its industry, with thousands of Generators in the field, lucrative contracts with big customers yielding a track record of consistent revenue, and extensive experience in making and maintaining the Generators and finding customers for them.

6. That was all a sham.  The Company had manufactured and put into service far fewer Generators than it claimed, and made hardly any of its revenue from leasing Generators.  In fact, Company S did not actually manufacture about two-thirds of the Generators that it purportedly sold to investors.  Recent intensive efforts by investors to locate the Generators have identified just 5,858 of the approximately 17,600 Generators for which the Company entered into investor contracts.  Investors paid hundreds of millions of dollars for Generators that never existed.  And, legitimate lease income from actual end-users of the Generators represented a tiny fraction -- less than 5% -- of Company D's revenue.  The vast majority of Company D's revenue was comprised of investor funds transferred from Company S.  In reality, the vast majority of investor funds was not being used to manufacture, place into service, and maintain the thousands of Generators that the Company was using as the basis for investment contracts, but was instead being pilfered by Individuals 1 and 2 for their personal benefit, such as the purchase of luxury vehicles and real estate, and used to make lease payments and distributions to earlier investors.

7. Defendant Karmann played a key role in the scheme by helping to create the false appearance that Company D was generating legitimate lease revenue.  Karmann is a certified public accountant who ultimately served as the Chief Financial Officer of Company S.  As Company D did not have its own CFO and was closely affiliated with Company S, Karmann performed essentially the same CFO duties for

Company D as well. Throughout much of the scheme, because Company D was generating minimal amounts of legitimate lease revenue from end-users of the Generators, Karmann transferred money from the bank account of Company S to the bank account of Company D each month. These transfers allowed Company D to make the lease payments that it owed to investors and conceal the fact that it was generating hardly any revenue from sub-leasing the Generators to end-users. Karmann also provided false information to investors concerning the source of Company D's revenue and the sub-leases of their Generators.

8. As a result of the conduct alleged herein, Defendant has violated the antifraud provisions of the Securities Act and the Exchange Act. The SEC brings this action and seeks entry of permanent injunctions against Defendant as well as disgorgement of ill-gotten gains and prejudgment interest thereon and civil penalties.

## THE DEFENDANT

9. Robert A. Karmann is a resident of Clayton, CA. He was the CFO and prior to that, the Controller, of Company S from late 2014 through 2018. He holds a CPA license in California.

## RELATED INDIVIDUALS AND ENTITIES

10. Company S is a California corporation headquartered in Benicia, CA. It was owned by Individual 1. Company S is not registered with the SEC in any capacity. It filed for bankruptcy protection in early 2019 and is currently in Chapter 7 proceedings.

11. Company D is a California corporation headquartered in Benicia, CA. It was owned by Individual 2. Company D is not registered with the SEC in any capacity. It filed for bankruptcy protection in early 2019 and is currently in Chapter 7 proceedings.

12. Individual 1 was a resident of Martinez, CA during the relevant time period. In addition to owning Company S, Individual 1 was the President and a Director of Company S and the Vice President and a Director of Company D.

13. Individual 2 was a resident of Martinez, CA during the relevant time period. In addition to owning Company D, Individual 2 was the President, Secretary, Treasurer, and a Director of Company D and the Secretary, Treasurer and a Director of Company S.

14. Ronald J. Roach is a resident of Walnut Creek, California. Roach was a certified public accountant and the owner of Ronald J. Roach Accountancy Corporation. He has held Series 6, 7, 63 and 65 securities licenses and was a registered investment adviser and a registered representative.

## FACTUAL ALLEGATIONS

**A.  Background on the Company**

15. Individuals 1 and 2 are the owners and principals of Company S and Company D. To investors, the Company claimed that it "design[ed], manufacture[d] and lease[d] renewable energy products to serve the off-grid needs of a broad and diverse marketplace – while providing investors with access to the renewable energy asset class."

**B.  The Company Offerings**

**(1)  The Solicitation of Investors**

16. Since at least 2011 and continuing to December 2018, the Company offered securities to investors. The securities took the form of two types of investment contracts: (1) Investment Fund Contracts and (2) Sale-Leaseback Contracts. Under both arrangements, the investors paid to purchase Generators from Company S, while simultaneously leasing them to Company D. Company D would then arrange to sub-lease the Generators to end-users. The investors expected to profit from the investments due to tax credits, depreciation on the Generators, and lease payments. Investors thus played an entirely passive role: the success of the venture, and thus the profits to investors and the Company, turned entirely on the efforts of the Company to make, maintain, market, and lease the Generators.

17. Over the course of the offerings, the Company raised approximately

$910 million in investor money.  These deals had face values of more than $2.7 billion because investors in the Investment Fund Contracts financed approximately 70 percent of the amount of their investments through promissory notes.

18.     The Company, directly and indirectly, solicited investors through brokers and salespeople using various methods, including email, conference calls and in-person meetings.  The Company offered and sold Investment Fund Contracts and Sale-Leaseback Contracts through interstate commerce to investors across the United States.

19.     The Company marketed itself as having extensive experience and capabilities in the renewable energy field and in executing successful transactions for investors.  For example, pitch-books for investors, which were prepared by a broker working on behalf of the Company using information provided by the Company, emphasized that the Company had thousands of Generators deployed and manufacturing capabilities of 900 Generators per month.  They also highlighted that the Company had closed many prior investment funds with "headline" or "notable" investors, including funds with fair market values near or over $100 million, and that the "performance of each of the funds remains in good standing."  In addition, the materials claimed the Company had "customer relationships with leading companies in the telecommunications, entertainment and construction industries" and provided case studies of the established leasing arrangements with many of those customers.  Finally, certain of the pitch-books provided a "Summary of Investor Returns" with estimated internal rates of return ranging from 40 to as high as 50 percent.

**(2)     The Terms of the Investment Fund Contract Offerings**

20.     Investment Fund Contract investors executed a standard package of agreements, including:  (i) a Limited Liability Company Agreement ("LLC Agreement"); (ii) a Solar Equipment Purchase Agreement ("Purchase Agreement"); (iii) a Secured Promissory Note ("Promissory Note"); and (iv) a Mobile Solar Equipment Lease ("Equipment Lease") (together the "Investment Fund Contracts").

The documents were executed at or around the same time, with Individual 1 signing the Purchase Agreements on behalf of Company S and Individual 2 typically signing the Equipment Leases on behalf of Company D. While the Investment Fund Contracts for certain deals had minor variations in wording, they largely had the same substantive terms.

21. Under the terms of the LLC Agreement, an investor became the "Investor Member" of the Investment Fund Limited Liability Company ("Investment Fund"), an entity created specifically for the purpose of the investment. This Investment Fund then purchased Generators from Company S at a price of $150,000 per Generator under the Solar Equipment Purchase Agreement. The Purchase Agreement specified the total number of Generators being purchased as well as the total purchase price. An Exhibit to the Purchase Agreement contained a blank space for the Vehicle Identification Numbers ("VINs") for the Generators or stated that "VIN for each Generator to be Supplied at Delivery." In exchange for the payment, Company S agreed to deliver the Generators by a certain date or dates and warranted "to Buyer that all Equipment shall be in good working order in conformity with the Specifications for a period" of five or ten years.

22. The delivery dates for tranches of Generators specified in the Purchase Agreements were often scheduled in stages. Likewise, the Purchase Agreements dictated that payments would be due to Company S in stages according to a schedule in part dictated by capital contributions being made by the investor under the terms of the LLC Agreement. Those capital contributions were contingent on the investor receiving confirmation that the Generators were "Placed in Service" as evidenced by an "IE [Independent Engineer] Certificate."

23. Investors generally contributed about thirty percent of the purchase price in cash and financed the balance pursuant to a Promissory Note or Notes executed by the Investment Fund in favor of Company S. The Promissory Note was an exhibit to the Purchase Agreement. The Company told investors, and arranged for a tax

opinion letter from a law firm confirming, that the Generators qualified for the Energy Credit under Internal Revenue Code § 48. That provision allows for a thirty percent tax credit for certain energy-related investments. Thus, investors expected to be able to take a tax credit for roughly the same amount as their cash contribution to the investment.

24. Under the Investment Fund Contracts, the Generator business was left entirely to the Company. At the time the Investment Funds executed the Purchase Agreement with Company S, the Investment Funds also executed the Mobile Solar Equipment Lease with Company D for at least the first batch of Generators being purchased. Depending on the size of the transaction, as additional tranches of Generators were manufactured, additional Equipment Leases were executed. Under the Equipment Leases, the Investment Funds leased their Generators to Company D for terms ranging up to 120 months. The Equipment Leases provided that Company D shall use "the Solar Equipment in a careful and proper manner" and "shall comply with all laws, regulations and ordinances." Moreover, the Equipment Leases stated that Company D shall be "solely responsible for the maintenance and repair of the Solar Equipment" and "shall ensure the Solar Equipment is operational and capable of producing solar energy at all times." The Equipment Leases required Company D to "obtain, maintain and keep" insurance coverage on the Generators in the amount of the replacement cost as well as "liability insurance." In addition, the Equipment Leases required Company D to "promptly pay when due, all license fees, registration fees, sales taxes, use and property taxes, assessments, charges and other taxes" imposed upon the Generators.

25. The Equipment Leases further provided for a set amount of "Base Rent" to be paid to the Investment Fund in advance in monthly installments for the term of the lease as well as payment to the Investment Fund of "Additional Rent" or "Variable Rent" to the extent Company D received revenue from subleasing the Generators in excess of a certain amount. The amount of additional or variable rent

due to the Investment Fund varied depending on the deal and the calculation was specified in the Equipment Lease.

26. The Investment Fund Contracts were structured such that there was a flow of money between the Investment Funds and the Company, all of which was contingent on the Generators generating significant sub-lease revenue from legitimate end-users. Company D owed monthly lease payments to the Investment Funds purportedly to be paid with the sub-lease revenue it received from third-party customers. The Investment Funds would then use the lease payments they received from Company D under the terms of the Equipment Leases to make monthly payments due to Company S under the terms of the Promissory Notes. Investors expected several benefits under the arrangement, including the thirty percent energy tax credit and the ability to claim significant depreciation on the Generators. In addition, investors expected to receive yearly cash distributions from the Investment Funds. In general, the LLC Agreements stated that "Distributable Cash," defined as the amount of cash from lease revenue remaining after loan payments and operating expenses, would be paid out to investors on an annual basis. Based on financial projections for the Investment Funds that were provided to investors, investors expected to receive these cash distributions.

27. From December 2011 through December 2018, the Company closed 34 Investment Fund Contracts, involving 13 investors, totaling about $2.57 billion in face value. The investors made roughly $759 million in cash contributions to their Investment Fund Contracts. Twenty-four of these Investment Fund Contracts, involving investor cash contributions of $651 million, were closed after Karmann joined Company S in 2014.

### (3) The Terms of the Sale-Leaseback Contract Offerings

28. The Company began offering the second type of security, the Sale-Leaseback Contracts, in around 2017. Investors in the Sale-Leaseback Contracts typically executed several agreements including: (i) a Sale Agreement; (ii) an

Equipment Lease Agreement; and (iii) a Schedule (collectively the "Sale-Leaseback Contracts"). Individual 1 typically signed the Sale Agreement on behalf of Company S, or in one instance on behalf of another affiliate of the Company, and Individual 2 typically signed the Lease Agreement and the Schedule on behalf of Company D. While the Sale-Leaseback Contracts for certain deals had minor variations in wording, they largely had the same substantive terms.

29. The Sale-Leaseback Contracts differed from the Investment Fund Contracts in that investors purchased the Generators outright from Company S, or in one instance another affiliate of the Company, without executing a Promissory Note. Under the Sale Agreement, investors paid $150,000 for each Generator they purchased. The Generators were identified by VIN in an exhibit attached to that Agreement. In exchange for the purchase price, Company S agreed to convey to the investors "all right, title and interest in" the Generators.

30. One Sale-Leaseback Contract transaction differed from the others in that the investor purchased used Generators and paid $82,500 for each. As the Generators were used, they did not qualify for the tax credit. However, the investment worked the same as the other Sale-Leaseback Contracts with the investor immediately leasing the Generators to Company D and being entirely reliant on Company D to maintain and sub-lease the Generators.

31. Just as was done in the Investment Fund Contracts, under the Sale-Leaseback Contracts the investors immediately leased the Generators back to Company D (or another affiliate of the Company) in return for monthly payments purportedly to be made from sub-lease payments. Under the Lease Agreement, Company D committed to keeping the Generators "in good repair" and operating condition and to "maintain" insurance coverage on the Generators as well as "liability insurance." The Lease Agreement also required Company D to pay, or reimburse the investor for, all taxes, fees, and assessments imposed on the Generators.

32. Like the Investment Funds, most investors in the Sale-Leaseback

Contracts received an "IE Certificate," or "IE Commissioning Report," for each new Generator that they purchased.

33. The Schedule to the Lease Agreement set forth the term of the lease and a set lease payment due to the investors from Company D each month. An attachment to the Schedule again identified the Generators by VIN. In addition to the monthly lease payments, most Sale-Leaseback Contract investors expected to be able to take the 30 percent energy tax credit as well as depreciation on the Generators they purchased. In fact, the Schedules in certain of the Sale-Leaseback Contracts specifically referenced the energy tax credit and depreciation and required Company D to use the Generators so as to remain eligible for those tax benefits. Based on the combination of tax benefits and lease revenue, the Sale-Leaseback Contract investors expected to earn a positive return and profit from these transactions.

34. From 2017 through 2018, the Company completed seven Sale-Leaseback Contracts, involving four investors, in transactions worth nearly $151 million. All seven Sale-Leaseback Contracts were completed after Karmann joined Company S.

### (4) The Company's Offerings Are Securities

35. The Company offered and sold the Investment Fund Contracts and Sale-Leaseback Contracts through interstate commerce to investors located in multiple states.

36. The Company's Investment Fund Contracts and Sale-Leaseback Contracts are securities in the form of investment contracts. They represented an investment of money, in a common enterprise, with the expectation of profits to be derived from the efforts of a third party. Investors provided money to the Company for investment purposes. Because the terms of the Investment Fund Contracts and Sale-Leaseback Contracts tied the fortunes of the investors to those of the Company and its ability to manufacture the Generators and then sub-lease them at optimal rates, investors were investing in a common enterprise. And, because the terms of the

Investment Fund Contracts and Sale-Leaseback Contracts made investors entirely dependent on the Company to manufacture, operate and maintain their purported Generators, the Company's efforts were essential to the failure or success of the common enterprise. Investors also had an expectation of profits from the tax benefits and payment stream to be generated from the enterprise.

**C.    Karmann Committed Deceptive Acts in Furtherance of the Fraud**

37. Unbeknownst to investors, most of the lease revenue paid to investors consisted of investor funds, rather than lease income from legitimate end-users of the Generators. Karmann knowingly took part in hiding these facts from investors and perpetuating the Company's fraud.

### (1)    Karmann Moved Funds Among Accounts

38. Lease revenue from end-users of the Generators was critical to the success of the investments because it would be the source of the funds that Company D needed to make lease payments to the Investment Funds and Sale-Leaseback Contract investors. Although Company D purported to be earning millions each month in lease revenue from end-users of the Generators, bank records demonstrate that Company D generated minimal lease revenue from sub-leases to end-users. In fact, the vast majority of funds flowing into Company D's bank accounts consisted of transfers of investor funds from Company S.

39. For example, during the period of January 2013 through December 2018, a total of about $409,930,000 was deposited to Company D's bank accounts. Of that amount, approximately $383,347,000 -- or 93.5% -- consisted of transfers from Company S's bank accounts. And, another $8,268,000 -- or 2.0% -- consisted of transfers from the bank accounts of different Investment Funds. At most, $18,316,000 -- or 4.5% -- of the deposits to Company D's bank accounts during the time period represented sub-lease payments from end-users of the Generators.

40. But, during this period, Company D paid about $347,800,000 to various Investment Funds and Sale-Leaseback Contract investors, most of which took the

1  form of "lease payments" owed under the operative Equipment Lease Agreements.
2  Accordingly, Company D's payments were not funded by legitimate sub-lease
3  revenue, but instead by investor funds cycled through Company S.

4      41.    Karmann played a key role in the monthly transfers of funds from
5  Company S to Company D throughout his time working with DC Solar.  Karmann
6  was introduced to the Company in 2013, when he was hired by Roach as a consultant
7  for Roach's accounting firm to work on various tax and book-keeping matters for the
8  Company.  During this period, Karmann became aware of the monthly transfers of
9  funds between Company S and Company D and was part of communications with
10 employees of Company S, including Individuals 1 and 2, about the amounts that
11 needed to be transferred so that Company D could make its lease payments to the
12 Investment Funds.

13     42.    In approximately August 2014, Karmann was hired as the Controller of
14 Company S.  When he first started as an employee of Company S, Karmann did not
15 have the ability to initiate bank transfers himself.  However, he calculated the
16 amounts that were owed by Company D to the Investment Funds each month and the
17 amounts owed by the Investment Funds to Company S under the terms of the
18 Promissory Notes.  He also calculated the amount that needed to be transferred from
19 Company S to Company D each month so that Company D could make the lease
20 payments owed to the Investment Funds and created spreadsheets that specified the
21 exact amounts that needed to be transferred among the various entities and in what
22 order.  After making these calculations, Karmann provided the information to
23 Individual 2 or other employees, who would then make the transfers.

24     43.    In early 2015, Karmann gained the ability to initiate transfers between
25 the bank accounts of Company S, Company D, and the Investment Funds himself.
26 Near the end of 2015, he became the CFO of Company S.  He continued to have the
27 ability to make transfers between the bank accounts of Company S, Company D and
28 the Investment Funds from early 2015 through the end of 2018.  Once he gained this

ability, Karmann became the person responsible for the cycling of the funds between the bank accounts of those entities to mask the lack of legitimate lease revenue from end-users of the Generators being earned by Company D.  Karmann, or other Company S employees working under Karmann, continued to calculate the amounts that were owed by Company D to the Investment Funds (and to some of the Sale-Leaseback Contract investors after those investments began in 2017) each month and the amounts owed by the Investment Funds to Company S under the terms of the Promissory Notes, as well as the amount that needed to be transferred from Company S to Company D to make all of these payments possible.  Each month, once the calculations were made, Karmann made the transfers between the various accounts.

44.   There were times when Company S had sufficient money in its bank account to fund all of the payments that Company D needed to make to the Investment Funds and the Sale-Leaseback Contract investors simultaneously.  However, there were months when Company S did not have sufficient money in its bank account to fund all of the lease payments that Company D needed to make.  As a result, transfers of money needed to be staggered to allow money to be cycled back to Company S from certain Investment Funds in payments under the Promissory Notes before additional transfers could be made from Company S to Company D to fund lease payments to different Investment Funds.  There also were instances when Company D missed making timely lease payments due to insufficient money being available in the bank account of Company S.  Due to the risk of there being insufficient money, Karmann's role in the determination of the transfer order was of critical importance.

45.   Karmann made the transfers of money in order to perpetuate the Company's fraudulent scheme and to give the false appearance to investors that Company D was generating sufficient lease revenue from end-users of the Generators for the investments to be profitable.  As the Controller and then CFO, Karmann had access to the bank accounts and the accounting records maintained in QuickBooks of

both Company S and Company D. He knew Company D was collecting minimal lease revenue from end-users of the Generators. He also knew that Company S was subsidizing Company D each month, mostly using investor funds, so that Company D could make the lease payments due to the Investment Funds and Sale-Leaseback Contract investors. And, he knew that investors were not informed of this arrangement. His actions helped to keep the scheme running as new and existing investors purchased additional Investment Fund Contracts or Sale-Leaseback Contracts during the years he was cycling money through the various accounts.

### (2)    Karmann Provided False Information to Investors

46. In addition to cycling money to perpetuate the scheme, at various points during his tenure as an employee of Company S from mid-2014 through late 2018, Karmann provided false information to investors about the actual amount of lease revenue generated from end-users of the Generators, the true source of the funds coming into Company D, and the status and performance of their investments.

47. Prospective investors routinely requested financial statements from Company D and Company S before investing. In response, the Company often provided investors with financial statements, including financial statements accompanied by "Accountants' Compilation Reports" for Company D and Company S covering various periods between 2011 through July 2018 and financial statements accompanied by "Independent Auditor's Reports" for Company S for each year from 2012 through 2017. The financial statements accompanying these reports contained false and misleading information.

48. The income statements for Company D accompanying the compilation reports falsely stated that Company D generated hundreds of millions of dollars of revenues in "Rental Income." In reality, the overwhelming majority of purported "Rental Income" consisted of intercompany transfers from Company S. The income statements were intended to mislead investors and potential investors into believing that Company D made hundreds of millions of dollars in "Rental Income" from end-

users of the Generators.

49. Similarly, the financial statements in the various compilation reports and independent auditor's reports for Company S also contained false information. The cash infusions of hundreds of millions of dollars from Company S to Company D were hidden in the "Direct Costs" category of Company S's income statements. In reality, these payments had nothing to do with the costs of manufacturing the Generators. Company S categorized the payments in this manner to conceal from investors the fact that Company S funded Company D's "Rental Income."

50. At various points between 2014 and 2018, Karmann sent certain of the financial statements and the accompanying reports via email to brokers to be passed on to investors or prospective investors and, on at least one occasion in 2015, directly to an existing investor which later made additional investments. As the Controller and then CFO, Karmann had access to the accounting records for Company S and Company D, and was fully aware that Company D had very little actual lease revenue and that Company S infused it with cash. Karmann therefore knew that the various compiled and audited financial statements contained false information. Karmann never told investors, prospective investors or brokers that information contained in these financial statements was false or inaccurate, but he recognized that such information would be important to them.

51. Karmann also provided false information to an investor (together with affiliates "Investor DV") about the details of the leases for the Generators owned by the Investment Funds in which Investor DV had invested. Investor DV invested in four Investment Funds between 2013 and 2015. After making these investments, Investor DV required quarterly reports for each of its Investment Funds. Beginning at least as early as the start of 2016, Karmann, or other employees of Company S working under and at the direction of Karmann, prepared these quarterly reports and provided them to Investor DV via email or through an online portal. The reports prepared for one of the Investment Funds contained the VIN, location, name of

company sub-leasing the Generator, lease term, and lease amount in dollars for each Generator owned by the Investment Fund.  The reports prepared for the other Investment Funds contained similar information but were not as detailed because all of the Generators owned by those Investment Funds were purportedly allocated to a single lessee.

52.   The information provided to Investor DV in these quarterly reports, including information about the companies sub-leasing the Generators and the amounts of the leases, was false.  Although Karmann relied on a member of the operations department at the Company and Individual 1 to provide the information about the Generators that he and/or his team then placed into the quarterly reports, Karmann knew that the information contained in the reports was false.  Karmann had access to the bank accounts and the accounting records in QuickBooks of Company D and, as a result, he knew that Company D was collecting virtually no money from the companies identified as the sub-lessees of the Generators.  And, he came to learn from an employee in the operations department that the Company could not track the locations of the Generators.

53.   Karmann, and/or members of his team acting at his direction, provided the quarterly reports to Investor DV for each quarter at least as early as the start of 2016 through the third quarter of 2018.  During those years, numerous additional investors purchased Investment Fund Contracts and Sale-Leaseback Contracts.  In providing these reports to Investor DV, Karmann assisted in keeping the fraudulent scheme afloat by lulling Investor DV into believing that its investments were performing as intended.  Karmann understood that had investors discovered that their Generators were not actually sub-leased to end-users and were not generating lease revenue, they likely would have taken action to protect their interests, the scheme would have been uncovered, and the Company would not have been able to defraud additional investors.

54.   Karmann profited from his work for the Company over the years,

earning at least $1.4 million in salary, bonuses, and other compensation between August 2014 and December 2018.

### FIRST CLAIM FOR RELIEF

**Fraud in Connection With the Sale of Securities**
**Violations of Section 10(b) of the Exchange Act**
**and Rules 10b-5(a) and (c) Thereunder**

55.     The SEC realleges and incorporates by reference paragraphs 1 through 54 above.

56.     Defendant Karmann, by engaging in the conduct described above, directly or indirectly, in connection with the purchase or sale of a security, by the use of means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange, with scienter:

    a.     employed devices, schemes, or artifices to defraud; or

    b.     engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

57.     By engaging in the conduct described above, Defendant Karmann violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rules 10b-5(a) and (c) thereunder, 17 C.F.R. §§ 240.10b-5(a) & 240.10b-5(c).

### SECOND CLAIM FOR RELIEF

**Fraud in the Offer and Sale of Securities**
**Violations of Sections 17(a)(1) and (3) of the Securities Act**

58.     The SEC realleges and incorporates by reference paragraphs 1 through 54 above.

59.     Defendant Karmann, by engaging in the conduct described above, in the offer or sale of securities by the use of means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly:

    a.     with scienter, employed devices, schemes, or artifices to defraud;

or

b. engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

60. By engaging in the conduct described above, Defendant Karmann violated, and unless restrained and enjoined will continue to violate, Sections 17(a)(1) and (3) of the Securities Act, 15 U.S.C. § 77q(a)(1) and (3).

## PRAYER FOR RELIEF

WHEREFORE, the SEC respectfully requests that the Court:

### I.

Issue judgments, in forms consistent with Fed. R. Civ. P. 65(d), permanently enjoining Defendant, and his agents, servants, employees, and attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the judgment by personal service or otherwise, and each of them, from violating Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a), Section 10(b) of the Exchange Act, 15 U.S.C. §§ 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5.

### II.

Upon motion of the Commission, order Defendant to disgorge all ill-gotten gains he received, together with prejudgment interest thereon.

### III.

Upon motion of the Commission, order Defendant to pay civil penalties under Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d), and Section 21(d)(3) of the Exchange Act, 15 U.S.C. § 78u(d)(3).

### IV.

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

**V.**

Grant such other and further relief as this Court may determine to be just and necessary.

Dated:  December 17, 2019

/s/ Dean M. Conway
Dean M. Conway
Sarra Cho
Christopher Nee
Attorneys for Plaintiff
Securities and Exchange Commission